Filed 12/6/21 In re B.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re B.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. C.R., Defendant and Appellant. | D078765 (Super. Ct. No. SJ12895B) |

APPEAL from orders of the Superior Court of San Diego County, Rohanee Zapanta, Judge. Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

1

C.R. (Mother) appeals jurisdictional and dispositional orders issued in the Welfare and Institutions Code section 300[1] dependency proceedings for her now 16-year-old son, B.R. Mother primarily contends there is insufficient evidence to support findings by the juvenile court that: (1) B.R. had suffered, or was at substantial risk of suffering, serious emotional damage within the meaning of section 300, subdivision (c) and she was not capable of providing appropriate care for him; and (2) B.R.'s removal from her custody was necessary to protect him from serious emotional harm and there were no reasonable means to protect him without such removal. Because we conclude there is substantial evidence to support the court's findings, we affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

*Previous cases.* B.R. was born in 2005. In 2012, he became a dependent of the juvenile court for the first time after being repeatedly molested by his older brother and a paternal uncle. He was reunified with Mother and his dependency case was closed in 2015.

In 2016, the San Diego County Health and Human Services Agency (Agency) opened a voluntary case for B.R. for out-of-home services after Mother was unable to meet his mental health needs. He had been psychiatrically hospitalized multiple times during the previous months; had assaulted Mother, his teacher, his therapist, and a nurse; and had run across four lanes of traffic in an attempt to kill himself. The voluntary case was closed two months later after Mother refused to participate in the case plan.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

*Instant case.* In early November 2019, the Agency received a referral alleging that Mother had physically abused B.R. While visiting Los Angeles with Mother, B.R. had run away, jumped over walls, run into traffic, and acted aggressively toward others. He told law enforcement officers that Mother beats him. Mother denied physically abusing him. He was psychiatrically hospitalized for disregarding his own safety.

In mid-November, the Agency received a referral alleging that B.R.'s adult sister, A.B., had punished him for misbehavior by making him do planks. School staff observed gashes on the side of his neck. He stated that he had fought with his sister. Mother stated that a cat had scratched him and denied she or his sister had used corporal punishment or physically abused him.

In December, the Agency received a referral alleging Mother physically abused B.R. B.R. stated that Mother had thrown him to the ground on one occasion and hit him with a closed hand on another occasion. He was psychiatrically hospitalized after stating he wanted to kill himself. When his sister picked him up after his release from the hospital, he immediately ran away, walked to the Polinsky Children's Center (PCC) where he had been in the past, and asked to be admitted there due to physical abuse at home. Instead, he was transported to Rady Children's Hospital for a voluntary psychiatric safety assessment.

By the end of January 2020, B.R. had been psychiatrically hospitalized 18 times. In early February, he told a hospital social worker that the two linear abrasions on the side of his neck that she had observed were caused when his sister strangled him in December 2019. A hospital physician opined that his injuries were consistent with a history of strangulation. During an

3

interview with an Agency social worker, B.R. stated Mother had punched and kicked him, slammed him against the wall, and hit him with objects. He also stated that his sister had choked and scratched him. The social worker observed various bruises on his body, which he attributed to the abuse by Mother and his sister. He stated he did not feel safe returning home and was afraid of retaliation by Mother because of his disclosures regarding her abuse of him. He reported that he had run away from home about 30 times because of the abuse.

On February 7, 2020, the Agency filed the instant section 300 dependency petition alleging that B.R. was a child within the juvenile court's jurisdiction under section 300, subdivisions (a), (b)(1), and (c). Under section 300, subdivision (a), the Agency alleged that he had suffered, or was at substantial risk of suffering, serious physical harm inflicted by Mother and, in particular, alleged that Mother had subjected him to excessive physical discipline and that he was fearful of returning home for fear of retaliation for his disclosures. Under section 300, subdivision (b)(1), the Agency alleged that he had suffered, or was at substantial risk of suffering, serious physical harm as a result of Mother's failure to protect him adequately and, in particular, alleged that Mother had failed to adequately protect him from excessive discipline by A.B. and that he was fearful of returning home for fear of retaliation for his disclosures. Under section 300, subdivision (c), the Agency alleged that he had suffered, or was at substantial risk of suffering, serious emotional damage as a result of Mother's conduct and that he had no parent capable of providing him with appropriate care. In particular, it alleged that he suffered from a number of mental health issues, including bipolar disorder, post-traumatic stress disorder (PTSD), oppositional defiance

4

disorder (ODD), and possible schizophrenia, all of which required mental health treatment that Mother had failed, or been unable, to provide.

At his detention hearing, the juvenile court found that the Agency had made a prima facie showing on the petition's allegations and ordered that B.R. be detained at PCC, an approved foster home, a short-term residential treatment program or an adjunct, consistent with the treatment recommendations on his discharge from the hospital. At the hearing, counsel for B.R.'s father, R.R. (Father), represented that Father was willing, but not yet able, to care for him.

In its March 2020 jurisdiction and disposition report, the Agency stated that B.R. remained psychiatrically hospitalized and a temporary conservatorship over him had been ordered in late February. When an Agency social worker asked Mother what needed to be done to make his return home safe, Mother stated that he needed extra locks and alarms in the home, as well as a GPS device to help her locate him if he were to run away. She wanted the Agency to find his allegations of abuse to be false and return him home. B.R. told the social worker that he wanted to live with Father because he knows how to take care of him. He did not want to live with Mother because she hurts him physically and verbally and scares him. In light of his temporary conservatorship, the Agency recommended that the juvenile court suspend B.R.'s dependency proceedings.

In early March, at the initial jurisdiction and disposition hearing, the court suspended B.R.'s dependency proceedings pending a future conservatorship meeting.

In late March, B.R. was discharged from the hospital and detained at the Star View Adolescent Center (Star View), a locked facility in Los Angeles

5

County, which placement was approved by his temporary conservator and ordered by the juvenile court.

In its September addendum report, the Agency stated that B.R.'s temporary conservatorship had been terminated in August and he had agreed to remain at Star View pending a child and family team (CFT) meeting to discuss his placement options. At a later CFT meeting, his Star View therapist reported that B.R.'s behavior had improved since he had been placed there. However, he had to be physically restrained 50 times in the past six months. Representatives from B.R.'s school district expressed concerns that his educational needs were not being met at Star View. When they had assessed B.R. in February, they recommended residential treatment at Copper Hills in Utah, which is a hospital-like setting but with a full school day and teachers and staff. The Agency social worker stated that B.R. would not agree to an out-of-state placement because he wished to be close to Father. Following the CFT meeting, the Agency was unable to locate any available placement options. B.R. told the Agency social worker that when he gets angry, he is "used to socking someone in the face." He stated it was difficult for him to remember the coping skills that he had been taught. He also stated that he would prefer to live with a family member rather than remain at Star View, which was a difficult placement for him. The Agency recommended that the juvenile court make true findings on the section 300 petition's allegations and declare B.R. a dependent of the court. It further recommended that the court find, by clear and convincing evidence, that B.R. should continue to be removed from Mother's custody and there were no reasonable means to protect him other than removal from her custody.

At the continued jurisdiction and disposition hearing in September, Mother requested a contested hearing on the petition and the Agency's recommendations, and the court set the matter for trial.

In its November addendum report, the Agency stated that B.R.'s therapist at Star View reported his behavior had improved. He also reported that B.R. frequently wanted to spend more time speaking with or visiting Father. However, two days later, B.R. informed the Agency social worker he wanted to leave Star View because he was upset that his behavior "color" level had been lowered as a result of a physical altercation he had with a peer. B.R. stated that he was fearful he would "severely physically assault" staff if he remained at Star View.

In its December addendum report, the Agency stated that in mid-November, B.R. had run away from Star View, but returned safely the following day. A few days later, B.R. rescinded his voluntary consent to remain at Star View and he was discharged against medical advice. At an emergency special hearing, the juvenile court authorized B.R. to move to PCC. A few days after his placement at PCC, he was punched by another child, which ultimately led to mutual physical assaults. After staff intervened and the other child walked away, B.R. yelled that he was going to "murder" the child. He disregarded staff direction to return to his cottage and, instead, began fighting with the other child again. During that altercation, B.R. struck one of the intervening staff members in the face. Later, after retrieving a piece of wood, B.R. forced open the door of the other child's cottage, charged at the child, and struck the child with the piece of wood. After they were separated by staff and the other child left, B.R. began pacing back and forth and screaming for everyone to get away from him. He then grabbed a "piece of a tree" and, noticing that the other children were

7

gone, attempted to strike a staff member with it. B.R. was then placed in a standing restraint by staff. He then threatened to kill the other children. Police officers responded, had staff members release B.R., and then handcuffed and questioned him. A few days later, B.R. stated that he wanted to die and was psychiatrically hospitalized.

In early December, when a PCC staff member asked B.R. to leave the kitchen, B.R. threw a cup of water in the staff member's face, punched her in the right upper neck, and grabbed her neck. While placed in a standing restraint, B.R. became more assaultive and began hitting the staff member with his knee on her right leg and crotch area. He grabbed her lanyard, attempted to choke her, and bit her left upper arm and would not let go. Police officers responded, arrested B.R., and detained him at juvenile hall due to his aggressive behavior. B.R. was charged with assault likely to produce great bodily injury and making criminal threats.

When informed about B.R.'s violent behavior, Mother told an Agency social worker that the allegations against B.R. were not true and he was "not usually a violent kid." Mother surmised that his violence may be the result of medication, the environment, or his diet. When the social worker spoke with B.R. about the incident, B.R. stated that the staff member had first placed her hands around his throat and he was just trying to protect himself.

In its January 2021 addendum report, the Agency stated that B.R. told its social worker that he would like to return to Star View if he could not live with Father. He did not want to go out of state because it would cause him stress. The Agency also summarized the results of B.R.'s psychological evaluation performed by psychologist, Dr. Julio Cesar Armenta, Ph.D., in December 2020. Dr. Armenta diagnosed B.R. with ODD, PTSD, attention-

8

deficit/hyperactivity disorder (ADHD), cannabis abuse and other substance abuse, and apparently "rule[d] out" diagnoses of bipolar disorder and psychotic disorder not otherwise specified. Dr. Armenta concluded that B.R. was in need of clinical intervention in a structured environment with psychoactive medication and participation in individual and group psychotherapy and conjoint sessions with his caretaker. The complete confidential psychological evaluation was attached to the Agency's addendum report.

In late February, with his consent, B.R. returned to Star View. Thereafter, he acted aggressively toward himself and others on several occasions. He understood that if he was no longer able or willing to remain at Star View, that he would go back to juvenile hall.

*Contested jurisdiction and disposition hearing.* In late February and March 2021, the court held the contested jurisdiction and disposition hearing over four days. The court admitted in evidence the Agency's reports and also reports concerning B.R.'s juvenile justice matter. It also admitted several exhibits offered by Mother. The court heard testimony from B.R., A.B., Mother, Father, Julie Cole, three Agency social workers, and other witnesses. The court also admitted and viewed video recordings of the depositions of Dr. Hannah Sweet and Dr. Nicole Ayson.

B.R. testified, among other things, that he really liked reconnecting with Father and wanted to live with him. He was angry that Mother had prevented him from having contact with Father in the past. He denied that he threatened to kill the PCC staff member and stated she had her hands around his throat and was trying to choke him. He testified that when he lived with Mother, they would argue and Mother would throw him on the

9

ground, slam his head on the ground, and hit him. Sometimes, Mother would make A.B. discipline B.R. He testified that he is nervous and anxious when in Mother's presence.

A.B. testified that she was 26 years old and was very connected with B.R. She denied intentionally harming him and denied witnessing Mother harm him. However, she admitted Mother had "popped" her as a child. She could not recall an incident during which she made B.R. do planks for punishment. She testified that B.R. received his neck injuries from her cat, but she was not home at the time.

Mother testified about the various services in which B.R. participated before his dependency case began. She denied using corporal punishment on B.R. in the past five years. She "guess[ed]" that B.R.'s neck injuries were caused by the cat scratching him. She testified that if the juvenile court did not intervene, she would allow B.R. to remain at Star View until she could find another placement for him. B.R.'s school district had placed him in residential facilities on two prior occasions.

Julie Cole, a mental health case manager for the San Diego County Office of Education, testified that she worked with school districts to locate residential facilities for students and provided mental health case management for students while in residential placements. After her assignment to B.R.'s case in March 2020, she located a placement for him at Copper Hills. There were no authorized providers in California that would accept him. She described the services available to students at Copper Hills. However, at the time of the contested hearing, B.R. did not have a place available at Copper Hills. As a result, Cole would have to submit a new

application to Copper Hills with updated information for its consideration of B.R. She was unaware that B.R. was currently facing criminal charges.

Cristina Gil de Montes, an Agency social worker, testified that she did not believe B.R. could reside safely in a family placement based on his needs and the recommendations of professionals that he needed a higher level of care. She was aware Mother had been attempting to obtain a locked facility placement for B.R. out of state, but was also aware that B.R. did not want to go out of state. She believed B.R.'s wishes for placement should be considered if those wishes would contribute to his progress, treatment, and motivation. She had not researched Copper Hills, which Mother had proposed for a possible placement of B.R. In any event, intervening events required a reassessment of its appropriateness for him. She testified that she had concerns about Mother following through with an out-of-state placement because that had been her plan for B.R. two years before.

Dr. Sweet, a psychiatrist, testified in her deposition that B.R. came to her unit at the hospital quite frequently from July 2018 through March 2020. She recalled that Mother never wanted hospital staff to speak with Agency social workers during B.R.'s hospitalizations. B.R. showed self-injurious and assaultive behavior while hospitalized. As of March 2020, she did not believe that Mother could adequately meet B.R.'s mental health needs. After his hospital discharges, B.R. "[f]or whatever reason," kept returning to the hospital. She testified that B.R. kept running away and stated he did so to get away from Mother because he did not feel safe with her and his sister. Dr. Sweet testified that she referred B.R. to the conservator's office based on his pattern of hospitalizations and inability to remain at home. She believed a locked residential facility was the only safe option for B.R. She was aware

11

that B.R. had previously been placed at a locked residential facility through his school district, but Mother had removed him from that facility.

Dr. Ayson, a child abuse expert, testified that she had reviewed photographs of B.R.'s injuries, but had not examined him. The injuries shown on B.R.'s neck were consistent with a history of strangulation and his report that he had been strangled by his sister, but they were not diagnostic proof of strangulation. It was possible those injuries were caused by cat scratches or by B.R. picking on older injuries.

After counsels' closing arguments, the juvenile court: (1) dismissed the petition's section 300, subdivision (a) allegation, finding there was insufficient evidence to support it; (2) amended the section 300, subdivision (b)(1) allegation to conform to proof and found that amended allegation true; and (3) found the section 300, subdivision (c) allegation true. It then declared B.R. a dependent of the court. The court stated, among other things, that it believed B.R.'s testimony that it made him nervous and anxious to be in Mother's presence such that he did not want to be around her. Although the source of B.R.'s fear of Mother was unclear, the court concluded B.R. was experiencing a consistent, credible, and very real fear for his safety if he were to be returned to Mother's home. The court then found, by clear and convincing evidence, that B.R. should continue to be removed from Mother's custody pursuant to section 361, subdivision (c) and that there were no reasonable means to protect him without removing him from Mother's custody. It ordered that B.R. be placed in a short-term residential treatment program or licensed group home and, in particular, authorized his continued temporary placement at Star View. The court also ordered reunification services for Mother and Father, supervised visitation for Mother, and

12

unsupervised visitation for Father. Mother timely filed a notice of appeal challenging the jurisdictional and dispositional orders.

DISCUSSION

I

*Substantial Evidence Supports the Court's Jurisdictional Order*

Mother contends the juvenile court erred by issuing its jurisdictional order making B.R. a dependent of the court because there is insufficient evidence to support its finding of jurisdiction under either section 300, subdivision (b)(1) or section 300, subdivision (c).

A

" 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) In particular, section 300, subdivision (c) provides that a child is within the jurisdiction of the juvenile court and may be adjudged a dependent child of the court if the child has suffered serious emotional damage, or there is a substantial risk that the child will suffer serious emotional damage, "evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." A section 300 petitioner has the burden to prove by a preponderance of the evidence that the petition's allegations are true and the child is therefore subject to the court's jurisdiction. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re Brison C.* (2000) 81

13

Cal.App.4th 1373, 1379.) Under section 300, the court considers the circumstances at the time of the jurisdictional hearing in determining whether the child is at risk of harm. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) "A juvenile court need not wait until a child is seriously abused or injured before it takes jurisdiction . . . , and the court may consider past events in deciding whether a child currently needs its protection." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.)

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*In re Isabella F.*, *supra*, 226 Cal.App.4th at p. 137.) In applying the substantial evidence standard of review, we "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996; see also, *In re Isabella F.*, at pp. 137-138; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.) Substantial evidence does not mean "any" evidence, but only that evidence which is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) We do not consider the credibility of the witnesses or reweigh the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Isabella F.*, at p. 138.) A finding is supported by substantial evidence if a trier of fact could reasonably make that finding in light of the entire record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823; *In re N.M.* (2011) 197 Cal.App.4th 159, 168.) On appeal, the parent has the burden to show there is insufficient evidence to

14

support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; *In re N.M.*, at p. 168.)

B

Mother initially argues that there is insufficient evidence to support the juvenile court's true finding on the petition's section 300, subdivision (b)(1) allegation, as amended by the court. As the Agency notes, the court found there was insufficient evidence to prove that any of B.R.'s recent injuries were specifically caused by Mother or A.B., as opposed to other possible causes. As a result, the court amended the petition to strike "the language with regard to [A.B.]", specifying the language that A.B. had "excessively physically disciplined [B.R.]" and that he needed protection from her. However, the Agency concedes that the court's amended language "does not make sense" and it is therefore "unable to defend it on appeal." For purposes of our disposition of this appeal, we accept the Agency's concession and assume arguendo that the court erred by making a true finding on the petition's section 300, subdivision (b)(1) language, as amended by the court.

C

Notwithstanding the court's assumed error in making a true finding on the petition's amended section 300, subdivision (b)(1) language, we nevertheless conclude there is substantial evidence to support its separate true finding on the alternative basis for its dependency jurisdiction, i.e., the petition's section 300, subdivision (c) allegation. A juvenile court's jurisdictional order must be affirmed if there is substantial evidence to support its jurisdiction based on any *one* of several grounds alleged. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) Accordingly, we now focus on

the evidence in support of the court's true finding on the petition's section 300, subdivision (c) allegation.

To find dependency jurisdiction under section 300, subdivision (c), the juvenile court here was required to find, by a preponderance of the evidence, that B.R. had suffered serious emotional damage, or there was a substantial risk that he would suffer serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or others, as a result of Mother's conduct or having no parent (e.g., Mother) capable of providing him with appropriate care. The Agency's petition alleged that B.R. was a child under section 300, subdivision (c) because, inter alia, he suffered from a number of mental health issues, including bipolar disorder, PTSD, ODD, and possible schizophrenia, all of which required mental health treatment that Mother had failed, or been unable, to provide. At the contested jurisdictional hearing, the court admitted in evidence all of the Agency's reports, which included extensive discussions of B.R.'s mental health issues, as described above. Prior to the filing of the instant dependency petition in February 2020, B.R. had been psychiatrically hospitalized 18 times. While at Star View's locked residential facility from March 2020 to September 2020, B.R. had to be physically restrained 50 times for his aggressive behavior. In December 2020, after B.R. had voluntarily chosen to leave Star View and was placed at PCC, he was involved in a number of physical altercations with other children and staff members. In particular, during one incident he forced open the door of another child's cottage, charged at the child, and struck the child with a piece of wood. Later, noticing that the other children were gone, he attempted to strike a staff member with it. When restrained by staff, B.R. threatened to kill the other children. A few days later, B.R. stated that he wanted to die

16

and was psychiatrically hospitalized. During another incident, B.R. threw a cup of water in a staff member's face, punched her in the right upper neck, and grabbed her neck. While restrained, he hit the staff member with his knee on her right leg and crotch area. He grabbed her lanyard, attempted to choke her, and bit her left upper arm and would not let go.

In his psychological evaluation of B.R. in December 2020, Dr. Armenta diagnosed him with ODD, PTSD by history, ADHD by history, cannabis abuse and other substance abuse, and apparently ruled out diagnoses of bipolar disorder and psychotic disorder not otherwise specified. He noted that B.R. had a history of suicidal ideation, episodes of self-mutilation, and aggressive and assaultive behavior. Dr. Armenta opined that B.R.'s domestic environment appeared to have played a critical role in the deterioration of his behavior. Dr. Armenta concluded that B.R. was in need of clinical intervention in a structured environment with psychoactive medication and participation in individual and group psychotherapy and conjoint sessions with his caretaker.

Dr. Sweet testified at her deposition that she frequently saw B.R. at her hospital unit from July 2018 through March 2020. B.R. showed self-injurious and assaultive behavior while hospitalized. As of March 2020, she did not believe that Mother could adequately meet B.R.'s mental health needs. After his hospital discharges, B.R. kept returning to the hospital. Dr. Sweet testified that B.R. kept running away and stated he did so to get away from Mother because he did not feel safe with her and his sister. She believed a locked residential facility was the only safe option for B.R.

Based on the above evidence, we conclude, and Mother concedes, that there is substantial evidence to support the juvenile court's finding under

17

section 300, subdivision (c), by a preponderance of the evidence, that B.R. had suffered serious emotional damage, or there was a substantial risk that he would suffer serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others. The above evidence overwhelmingly shows that B.R. had suffered from serious emotional and mental health issues for many years and those issues continued through the time of the contested hearing, as reflected in his recurrent suicidal ideations and psychiatric hospitalizations and many incidences of violence and other aggression against others.

Contrary to Mother's assertion, we further conclude that there is substantial evidence to support the court's additional finding under section 300, subdivision (c) that such serious emotional damage, or substantial risk of serious emotional damage, resulted from Mother's conduct and/or that Mother was not capable of providing appropriate care for B.R. The record shows that B.R. consistently stated that he was anxious and afraid of Mother. B.R. told a social worker that he did not want to live with Mother because she hurts him physically and verbally and scares him. At the contested hearing, B.R. testified that he is nervous and anxious when in Mother's presence. Dr. Sweet testified B.R. told her that he kept running away from home to get away from Mother because he did not feel safe with her and his sister. The above evidence supports a reasonable inference by the court that B.R. had suffered serious emotional damage, or was at substantial risk of suffering serious emotional damage, from Mother's conduct.

More importantly, regardless of whether Mother's conduct posed a substantial risk of serious emotional damage to B.R., we conclude there is substantial evidence to support a finding that Mother was unable to provide appropriate care for B.R. While B.R. was in Mother's custody prior to the

18

filing of the instant petition and through the contested hearing, he continued to suffer serious emotional and mental health problems, as described above. Based on its investigation, the Agency believed that Mother was unable to provide appropriate care for B.R. and recommended that the court make a true finding on the petition's section 300, subdivision (c) allegation. Gil de Montes, an Agency social worker, testified at the contested hearing that she did not believe B.R. could safely reside in a family placement based on his needs and the recommendations of professionals that he needed a higher level of care. Dr. Sweet testified that as of March 2020, she did not believe that Mother could adequately meet B.R.'s mental health needs. In his psychological evaluation, Dr. Armenta opined that B.R.'s domestic environment appeared to have played a critical role in the deterioration of his behavior. Based on the above evidence, the court could reasonably infer that Mother had shown an inability in the past to provide appropriate care for B.R.'s emotional and mental health needs. Accordingly, there is substantial evidence to support the court's true finding on the petition's section 300, subdivision (c) allegation and its order, based thereon, finding that it had dependency jurisdiction of B.R.

To the extent Mother cites other evidence or inferences therefrom that would have supported a contrary finding by the court, she misconstrues and/or misapplies the substantial evidence standard of review. (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 823; *In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.) On this appeal challenging the sufficiency of the evidence for an order or judgment, we must view the record in the light most favorable to the Agency, as the prevailing party below, and give due deference to how the juvenile court, as the trier of fact, may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the

19

evidence.  (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; *In re Isabella F.*, *supra*, 226 Cal.App.4th at pp. 137-138; *In re Shelley J.*, *supra*, 68 Cal.App.4th at p. 329.)  We do not consider the credibility of the witnesses or reweigh the evidence.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re Isabella F.*, at p. 138.)  By primarily citing evidence and/or arguing that she could have found a suitable placement for B.R. at Copper Hills in Utah, Mother has not carried her burden on appeal to show there is insufficient evidence to support the court's section 300, subdivision (c) jurisdictional finding.  Rather, the court could have reasonably concluded the availability of a Copper Hills out-of-state placement (*assuming* that facility were to still offer B.R. a placement in light of his intervening physical assaults and other violent or aggressive behavior since March 2020), did not prove Mother was capable of providing appropriate care for B.R.'s emotional and mental health needs.  In particular, the court could have concluded that the wishes of B.R., who was 15 years old at the time of the contested hearing, should be considered in determining his placement, as the Agency suggested, in order to make his placement most effective.  Here, B.R. stated he would be stressed by an out-of-state placement because he would be away from Father, with whom he had recently reunited in a positive and supportive relationship.  In addition, the court could conclude the Copper Hills placement was recommended by Cole based more on B.R.'s educational needs than on his serious emotional and mental health needs, and therefore the opinions of Dr. Sweet and Dr. Armenta regarding recommendations for his placement outweighed the opinions of Cole and Mother as to an appropriate placement for him.  Accordingly, Mother's reliance on a possible Copper Hills placement for B.R. does not show there is insufficient evidence to support the court's true finding on the section 300, subdivision (c) allegation.

20

## II

### *Substantial Evidence Supports the Court's Dispositional Order*

Mother contends that the court erred by issuing its dispositional order removing B.R. from her custody because there is insufficient evidence to support its dispositional findings that B.R.'s removal from her was necessary to protect him from serious emotional damage and that there were no reasonable means to protect him without such removal.

### A

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.*, *supra*, 197 Cal.App.4th at p. 169.) The court has broad discretion in choosing an appropriate disposition that serves the child's best interest. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) Before physically removing a child from his or her parent, the court must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means to protect the child without such removal.[2] (§ 361, subd. (c)(3); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) The court must also determine whether reasonable efforts were made to prevent or eliminate the need for removal of

---

[2] As relevant here, the juvenile court may remove a child from his or her parent if the court finds by clear and convincing evidence that "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ." (§ 361, subd. (c)(3).)

the child from his or her home and state the facts on which its decision to remove the child is based. (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.) To assist the juvenile court, the Agency must describe "the reasonable efforts [it] made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of potential detriment to the child if he or she remains with the parent." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 169.) In determining whether removal from a parent's home is necessary, the court may consider the parent's past conduct as well as current circumstances. (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) An order removing a dependent child from his or her home does not require proof that the parent is dangerous or has actually harmed the child. (*In re Cole C.*, at p. 917.) The purpose of removing a child from his or her parent's home is to protect the child from future possible harm. (*Ibid.*)

On appeal, we review the record for substantial evidence to support the juvenile court's dispositional findings and order, bearing in mind the heightened requirement of proof by clear and convincing evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154-155; *In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654.) Because section 361, subdivision (c) requires proof by clear and convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995-996; see also *In re V.L.*, at pp. 154-155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under § 361, subd. (c)].) Likewise, the substantial evidence standard of

22

review applies to a finding under section 361, subdivision (e) that reasonable efforts were made to prevent or eliminate the need to remove a child from his or her parent. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) We discussed above the principles that apply under the substantial evidence standard of review and therefore do not repeat them here.

B

Contrary to Mother's assertion, there is substantial evidence to support the juvenile court's dispositional findings, by clear and convincing evidence, that B.R. would be at substantial risk of emotional harm if returned home and that there are no reasonable means to protect him without such removal. (§ 361, subd. (c)(3).) In particular, the court could reasonably find, by clear and convincing evidence, that Mother was unable to provide proper care for B.R. and that he would suffer potential detriment if he remained with her. (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 169.) Because most of the evidence discussed in Section I(C) above in support of the court's jurisdictional finding also supports its dispositional finding, we incorporate that evidence into our discussion of the evidence supporting the court's dispositional finding and therefore do not repeat it specifically herein. Rather, we note the above evidence showed that although B.R. had been in Mother's custody for years prior to the instant dependency proceedings and contested hearing, he had many psychiatric hospitalizations, suicidal ideations, and engaged in violent or other aggressive behavior toward himself and others. B.R. told a social worker that he did not want to live with Mother because she hurts him physically and verbally and scares him. At the contested hearing, B.R. testified that he is nervous and anxious when in Mother's presence.

To the extent Mother argues the court should not have found removal of B.R. from her custody was necessary to protect him because she had

23

worked with Cole in March 2020 to find an out-of-state placement for him at Copper Hills, the court could reasonably infer that purported possible placement was now tenuous, at best, because of B.R.'s intervening violent behavior and pending juvenile justice case, which case could preclude his removal from the state. At the contested hearing, Mother's counsel conceded that Copper Hills may no longer accept B.R. for placement if it were advised of his violent assault on the PCC staff member. Cole testified that Copper Hills would require recent updates regarding B.R. for it to make a current determination whether to accept him. Furthermore, Gil de Montes testified that she had concerns about Mother following through with an out-of-state placement because she did not follow through with such a plan two years before. The record shows that a previous out-of-home voluntary case in which the Agency provided Mother with services for B.R. was terminated by Mother after only two months and the case was closed by the Agency as "unsuccessful." Thereafter, B.R.'s mental health declined, leading to multiple psychiatric hospitalizations. Gil de Montes also testified that B.R. does not wish to be placed out of state. The Agency previously reported that B.R. would not agree to an out-of-state placement because he wished to be close to Father. Importantly, Dr. Sweet testified that as of March 2020, she did not believe that Mother could adequately meet B.R.'s mental health needs. Finally, the court could reasonably find that Mother had not shown that a Copper Hills placement would appropriately address B.R.'s serious and long-standing emotional and mental health needs. Based on the above evidence, we conclude there is substantial evidence to support the court's dispositional findings, by clear and convincing evidence, that B.R. would be at substantial risk of emotional harm if returned to Mother's custody and that there are no reasonable means to protect him without such removal. (§ 361, subd. (c)(3);

24

*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917; *In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654; *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995-996; see also *In re V.L.*, *supra*, 54 Cal.App.5th at pp. 154-155.)  To the extent Mother cites evidence or inferences therefrom that would have supported a contrary finding by the court, she misconstrues and/or misapplies the substantial evidence standard of review.  (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 823; *In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

DISPOSITION

The orders are affirmed.


O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.